Deputy Christopher Sullivan, at all. I believe we're ready, Mr. Gordillo. Thank you. Your honors, may I please the court? Good morning. My name is Jason Gordillo. I'm proud to be here, and I'm also very honored to represent my clients, the Healdsburg County Sheriff's Office, Sheriff Chad Chronister, Deputy Brian Craig, Deputy Chris Sullivan, and Corporal Brian Levine. Counsel, let me tell you my concern about your case, and this is just me. We haven't discussed it. Florida law, as I understand it, and tell me if I'm wrong, means . . . child neglect means conduct or omission that could reasonably be expected to result in serious physical or mental injury or a substantial risk of death to a child. The DCA and Florida Supreme Court and DCA decision says it's more than ordinary negligence. It must be of a gross and flagrant character, evincing reckless disregard for human life. Only the most egregious conduct, done either willfully or with criminal culpability, the Arnold Court, which I think was second DCA, said child neglect is a difficult crime to prove. In the circumstances, the factual circumstances in Arnold look far worse for the parent in that case, parents in that case, than those in this case. The court even said, the DCA even said they were repulsive. They didn't put the child at risk of serious physical or mental injury, even though there was decaying food, feces smeared on the living room floor, piled in another room, plywood board with nails protruding outward where someone could step on it, a fused box with exposed wiring, mold between the doors of the refrigerators, cockroaches running everywhere. And the Arnold Court said, that's not child neglect. It has to be something worse than that. It seems like to me the problem you have is the conditions in this case weren't as bad as Arnold, and Arnold held that wasn't enough. Your Honor, also in Arnold, it also discusses that we have to consider the child's age, competence, and ability to avoid potential hazards. This child was two years old. This child was still in diapers. The other situation, I grant you the conditions of Ms. Bradbender's home were nowhere near what you've described in Arnold. However, there were dangerous conditions in that home. What was the most egregious condition that would give rise to an arrest on this sort of thing? We would say the two most egregious conditions would be the stairs that were directly outside of Ms. Bradbender's bedroom where the child was, with no baby gate. Stairs without a baby gate? Correct. Okay, so anyone who doesn't have a baby gate could be charged with child neglect? No, Your Honor. It is more a parent that is unable to wake up, a parent that is unable for 22 minutes before a rescue to become coherent. When a parent does something to put themselves in that position, they're the only adult in the home. When a person takes a sleeping pill, what was it, Ambien? They can't wake up too well from what I understand. And, Your Honor, she also described that she took a combination of Ambien and Xanax. The three deputies and fire rescue also said she smelled heavy of alcohol. But that was a disputed fact. The EMS said she didn't, that she didn't appear to be inebriated and she said she hadn't been drinking. We have to resolve that in her favor. Actually, in his report and in his deposition, EMS said that he did put alcohol in his report as one of his indicators. I thought he testified that she didn't smell of alcohol and he didn't think she was intoxicated. Have I got that wrong? No, Your Honor. He said she smelled heavy odor of alcohol and it was put in his report as well. And all that is in the record evidence. I'll get back to you when I find my note. We may be talking about different emergency people. Yes, and it was EMS Derek Bull, who's also the EMS that was in the room and also the one that authored the report from Hillsborough County Fire Rescue. The other, the second one, Your Honor, other than the stairs, is the open one. That was CPS that said that, wasn't it? That said the CPS person went there or the EMS? Correct. Child protection investigator arrived about two hours later. When he interviewed her, he said he couldn't smell the odor of alcohol, but he was six feet away from her. So he said he doesn't know whether she didn't smell of alcohol or it had dissipated in the two hours or he was too far away. Acara, A-I-C-K-A-R-A, the CPS investigator who interviewed Breadbinner before she was there, did not notice any signs of intoxication, end of quote, did not smell alcohol on her breath, and that she did not slur her speech. She said, I hadn't been drinking, I certainly didn't smell of alcohol, so we have to take it that she hadn't been drinking and didn't smell of alcohol. I will say to that point, and I don't want to argue with the court very much, but that interview with the CPS investigator was three hours later, approximately three hours later. The interview or when she and he interacted? Both. He didn't arrive to the scene until 5.30 in the morning. You're not talking about an interview of him, you're talking about his interview of her. Correct. Okay. Correct, Your Honor. So then there's... The people that were in the room when she was finally able to wake up were... The cop says we thought she'd been drinking because we smelled alcohol, and she testifies there was no smell of alcohol because I had not been drinking. She never testified she didn't smell of alcohol. She denied drinking, but she's never... Well, if she hadn't been drinking, she wouldn't have smelled... People don't put alcohol on as cologne. If she said, I wasn't drinking, does that not create a genuine issue of material fact as to whether they smelled alcohol on her? We believe it does not because they didn't arrest her for being drunk. I'm sorry. No, no, no, no. If you're saying she was intoxicated, and that adds into the mosaic of facts as to why the child was endangered, and I point out to you there's a genuine issue of material fact as to whether she was drinking, had been drinking, because she said she hadn't and therefore couldn't have smelled of alcohol, it's not a valid response to say she wasn't charged with being drunk. Your Honor, if we take what was their reasonable belief, what was the information that they had at the time? They couldn't have had a reasonable belief that she had been drinking unless they smelled alcohol. Correct. Okay. We agree on that, and she said, in effect, they couldn't have smelled alcohol because I hadn't been drinking. Very well. And fire rescue smelled as well, so there's another witness that has nothing to do with this lawsuit. You can have eight witnesses who said she smelled, and she says she didn't, and that's for the jury. I understand, Your Honor. Why it also doesn't matter is because what this case comes down to is the recent Supreme Court case, District of Columbia v. Wesby. This court's decision less than a year ago in Jones v. Franson and the prior decision from the Supreme Court about last January in White v. Pauley, all of which discussed clearly established law. I think we're getting into the weeds here about disputed facts because in qualified immunity cases we go with plain as best case and we don't worry about disputed facts. That's why I say if we just take away the alcohol, fine, give her the alcohol. They all testified both at deposition and at the hearing before the lower court. They weren't so much concerned about whether she was drunk or not. They were concerned about her level of incoherence, her inability to waken, what happened in those 22 minutes with fire rescue, what happened downstairs when she was unable to clothe the child that the deputy had to do it, when she was unable to pour the child a drink, the deputy had to do it, and the conditions of the home. They found when they got there at 3.30 in the morning that was unlike any other home in the neighborhood, was concerning to them in addition to what they learned from the father who was concerned standing outside. What was the second conduct you said that didn't close off the stairs? What was the second? The open windows were also the biggest concern for them as far as a child being able to crawl out of the house, someone being able to come into the house and hurt the child, hurt the mother. Anybody who sleeps, can't afford air conditioning, sleeps with the windows up and the screen on them is endangering the child's welfare. Again, Your Honor, that's not what we're saying. What we're saying is when you take the totality of the circumstances, when you take the totality of the house that they arrived at 3.30 in the morning that was wide open, everything was still on. It looked as if somebody hadn't gone to bed and closed up their house, turned off their lights like everyone else does in that neighborhood, everyone else does when they patrol in all their years of experience. Can I ask you a question about clearly established law? I think I agree with the premise of where you're going that the district court's clearly established law analysis is pretty skimpy. There's a lot of grinding on the facts of the constitutional violation and then not a whole lot of discussion of what might clearly have established the law. But the court gets close at, I don't know where this is, maybe 26, when the court says, Officers who find a mother and son in their bed sleeping soundly with no unreasonable hazard or evidence of any neglect cannot arrest the mother for child neglect, nor does a subsequent scenario in which a distressed mom surrounded by cops in the middle of the night who struggles to pour tea and dress a wriggly, agitated baby provide arguable probable cause for child neglect. Likewise, the additional fact that the mother lives in a two-story home, kept her toilet seat open, took a sleep aid after her child went to sleep, do not provide other support singularly or in the totality for arguable probable cause. So why isn't that paragraph sufficient? There are certain facts that are missing out of that paragraph, which is the court's not allowed to ignore certain facts. Yeah, so this is helpful. Tell me the key facts that you think are missing from her narrative. Number one, they didn't know if they were sleeping soundly or not because there was concern for her well-being. I thought part of their argument was she was sleeping too soundly. Too soundly to the fact that she couldn't wake up. The other thing that I think it was Deputy Sullivan said most eloquently is, and Deputy Craig, I believe, is when the child woke up, the child was on her screaming, yelling, frightened. She didn't wake up for that. Their concern is if you can't wake up with the child screaming next to you, what would have happened had the child woken up, gone down the stairs, fell downstairs, get hurt, screaming at the bottom of the stairs? She wouldn't be able to wake up for that. That's where the child neglect in their mind came in. Whether they're right or wrong, they're allowed reasonable mistakes under arguable probable cause. That's what we're saying. This, at most, is a reasonable mistake under the law. I also cited Pelakis, which was they found possibly a reasonable mistake based on the concealed weapons statute in Florida. The court said there was no case law providing the guidance that law enforcement may need to know that they were wrong, such as in this case, to your point, Judge Newsom. There was no support for this paragraph in her order. There's no case law saying this. This is Judge Scriven saying this. This is her belief. There's nothing providing guidance back in December 3, 2011, in the middle of the night, to these officers of prior cases, laying this circumstance out. Suppose the officers had gone there, and the only thing they found, the mother was instantly awakened when they walked in. The only thing they found in the whole house was the absence of a gate on the staircase. Is that enough to prove that it could reasonably be expected to result in serious physical injury or mental injury or a substantial risk of death to a child, reckless disregard for human life, et cetera? Would that have been enough? But do you have a case saying that's not enough? No, but I do have a law. All right, but why would they not be entitled to qualified immunity? Under your theory, we've got to have a case right on point. That's what the law requires, Your Honor. Well, then they would be entitled to qualified immunity. It's the only thing they found. Perfect house, taught in parenting class. This is how to keep your child safe, except for that gate on the stairway. I'm sorry, I think I might have misunderstood your question. What I was going to say is they've all been asked that question. Had she woken up immediately, would they have arrested her? And they all said, no, we wouldn't have arrested her. They can't fight the hypothetical any more than you can. I'm saying they get there, there's a gate missing. There's no case that says if the only problem is a gate missing on the stairwell, that constitutes child neglect. But suppose officers go to a house, same circumstances as this, except they get there, the windows are closed, there's no knife out, there's no urine on the floor, none of that. They get upstairs, just make sure everybody's okay, and they notice there's no gate, that's the only thing they find, and they arrest her for child neglect on that. There is no case saying that amounts to child neglect. Are they entitled to qualified immunity? I would say under that scenario, I would find a hard time arguing that because you don't have a lot of facts. But you could do it, couldn't you? I mean, you could just simply say there's no case on point. I can do, Your Honor, but in this case, there are so many factors on point. I agree with you. And the point I think we're agreeing is you don't have to have a case directly on point saying this clearly is not child neglect. Correct. So the question is whether when you combine it with Arnold, for example, this clearly is not child neglect. Under the scenario, under the facts of this case, I don't agree with that, Your Honor. I understand, but that's the question. No, and Your Honor. It's not the question whether this clearly isn't child neglect. You would admit if it clearly wasn't child neglect. Clearly. No reasonable person would have thought it was child neglect. They wouldn't be entitled to qualified immunity. The question is whether any reasonable person could have believed that it was child neglect, right? Right, and the standards are very reasonable. Let me ask you this, and forgive me, but I pulled up the Arnold case while we were talking to see the age of Tiffany Arnold and that. It doesn't give an age, does it? She's old enough to talk because they asked her questions, but . . . I can't answer that question. I just do know that they do cite to you need to also consider the child's age, comprehension, and ability. I don't know what the child's age was. She was speaking, at the very least. I'll take the court's word for it. All right. Thank you, counsel. We'll let you go over, but we'll give you your full four minutes and add a couple to Mr. Maddox's time as well if he needs it. Good morning, Your Honor. Michael Maddox for the record. It's a pleasure to be in front of the court. Tony, give him two more minutes, please. Your Honor, we start off with the fundamental principle that there are disputed facts which prevent this court from not upholding the district court's Doc 55 ruling which, as Judge Newsom pointed out, is very fact intensive and perhaps slight on the clearly established analysis. However, this court's well aware there are three ways that a matter can be shown to be clearly established. It would be with clear preexisting case law that is similarly aligned with facts, or the second could be when a broader, more clearly established principle, the key language going back to Hope and Peltzer is in the case of novel facts. While the Sheriff's Office would like to argue and appellants argue that these facts have never been seen before, the broader, clearly established principle prong of clearly established specifically says in the face of novel that an officer must have arguable probable cause before an arrest can be made to survive or to win a qualified immunity challenge. But you agree, right, that at that level of abstraction, not good enough. Not good enough to say the Fourth Amendment says you've got to have probable cause, there was none here, therefore clearly established. You recognize that you've got to get sort of deeper down into the weeds. Yes, we have to go into the weeds, Judge Newsom, to look at the specific facts. And going back to the narrative of disputed facts, interestingly in the appellant's brief, they state on page 40, quote, clearly no reasonable jury could believe appellant's version as it is blatantly contradicted by appellant's and EMS's bull's statements. That's their conundrum. The conundrum is that that's right, there are disputed material facts. If you look . . . Where did the arrest take place? Is it up the stairs in the bedroom or downstairs? I do think it's important and it is certainly analyzed by the district court. There's somewhat conflicting answers by the appellant defendants. First, Deputy Sullivan says that the defendants confined her to her living room and did not permit her to move to any other area of her home. So I guess in his mind the trigger is the confinement in the living room. Now looking at the facts, they encounter her up in the bedroom and they actually allow her to walk down, quote, steep stairs on their own. Carrying the baby. Carrying the baby that they're supposedly so concerned about. And at the time they walk into the living room is when he feels the trigger is pulled. Deputy Levine puts it back in time earlier. She was not free to leave after the fire department left. So we know at 322 . . . Deputy Levine. Yes. The problem is not what Deputy Levine thought. The problem is what a reasonable person in the suspect . . . Yes. . . . suspect's criminal position would have believed. I agree. Judge, the district court is very clear that that's what standards she's analyzing in her order. She specifically says what would a reasonable person think. So the issue is Ms. Bredbender has testified that she believed she wasn't free to leave because they told her she couldn't even get up off the bed. She wanted them to leave her home and she said that they said they weren't leaving and she couldn't get off of the bed. They would not allow her to use her telephone. They wouldn't tell her what time it was. So requests for a frame of reference that she made were denied. So clearly she wasn't free. So a reasonable person would believe with three armed deputies in a room, along with a Hillsborough County fire rescue person attempting to assess them, that they aren't going to be able to say, leave my home. And so that is a trigger for the arrest. And Chief Judge Carnes, it's consistent with what Deputy Levine believed at the time himself. Craig says three to four hours after contact with Bredbender because they were waiting for the CPI. So there is a difference between the deputies. But the important thing to focus on is the disputed fact, which as Your Honor said, Chief Judge Carnes, that she has said she wasn't drinking. So that's a material disputed fact. So what the case comes down to is somebody who has Christmas lights on, TV on, a few open windows, some lights downstairs, who's sleeping after taking a prescribed medication in her bed, and at that point she hasn't had anything to drink based on the undisputed facts in our favor. And they arrest her. Disputed facts. Right, the disputed facts that are in our favor based on her version, Your Honor. And as a result, no reasonable officer could believe that they could arrest her for child neglect under the culpable negligence standard of Florida law. They thought that she was drinking plus having no barrier at the steps and the windows wide open. Is that enough to charge her with child neglect? And Xanax and Ambien with alcohol? Well, I want to answer that, but that's not what they must have believed under the statute. Answer that. Okay. So, no, it would not be enough because she took a prescribed medication, and the fact is the case law or the statute itself says clearly that culpable negligence is consciously doing an act. The only conscious thing she did is take a legally prescribed medication and go to bed. She took two legally prescribed medications in combination, and Judge Silber's question was add alcohol to that in his hypothetical, and add the absence of a gate. Wouldn't that be child neglect? No, it would not because it's punishing a future unwitnessed, unoccurred, an act that hasn't happened. No, no, no, no. Child neglect, you don't have to have an injured or dead child. I understand. I mean, the elements say that. Well, but basically, would a reasonable person know it's likely to result? And our position is no because too many things have to happen. All that has to happen is the baby gets out of bed, the mother doesn't notice it, the baby goes over the stairs, two years old, tumbles down the stairs. Correct. The problem is that that would punish, as the order says, all kinds of parents that are not actively supervising their child at the time, a heavy sleeper, someone who was distraught, maybe a death in a family, and they had a hard time waking up. So it's not reasonable to punish that level of behavior. Would it be close to, I would think you would argue, requiring as a matter of law a date at the top of the stairs? It would be like a strict law, and shut your windows, and put your toilet seat down, and close your liquor cabinet, and clean up all spills, and make sure that you turn off the TV at night. And it's interesting because when you break the case down, Your Honors, and you ask the deputies their own opinions. For example, they said if we just drove by the house and we didn't have the non-neutral call of the interested party, Mr. McIntyre, we wouldn't investigate that house. If she hadn't been hard to wake up and we just went upstairs, we wouldn't have thought there was child neglect. Is that the problem with your argument? No, sir. You're getting into subjective beliefs of the officers about whether that would have been an arguable probable cause or probable cause, and that's not the standard. Whether any reasonable officer could have not qualified. I mean we've had officers testify in deposition. I didn't think we had probable cause to tell you the truth, and we've said it doesn't matter. The question is whether we think you had probable cause in a criminal case. And qualified immunity is whether we think a reasonable officer could have believed they had probable cause. Purely objective standard. Yes, but when you look at what they say, they say we did not observe any danger to the child's mental health, physical health, or emotional health other than these prospective fears that they graphed onto the situation. Which is what reasonably expected to result in means. Correct, but it's not reasonable when these are things that are seen day-to-day in houses all across America. It's been three dozen years since I had a two-year-old, but aren't they highly mobile? Yes, they are highly mobile. But if you look at these facts, Judge, it is a fact in the record that it took three minutes for the child to wake up, and according to EMT Bull, she took five minutes. So there's two minutes that supposedly the child is awake when she's not awake. And if this child's highly mobile, they're all highly mobile, and there's not gates at the top of all stairs. I mean, something that the majority of people do, if in fact the majority of parents don't have gates at the top of the stairs, would be difficult to classify as criminal negligence. Yes, Your Honor. In addition, it's almost like the way they look at the house is they go through the house and make it a mother fitness test. Is there anything that we could confabulate into a possible harm? And they just add that to their basket of facts until they get to the point where, well, there's so many risks in this home that it's possible that foreseeable that the baby could have been harmed, and as a result we're going to make an arrest. And what's interesting is at what point do they process those? A lot of the facts that they rely on are after they've already detained her at a level that's a functional equivalent of an arrest. So they can't retrospectively justify the arrest. In addition— How do we fit in what the husband said he saw through the window? Is that to be concerned with in the arrest? Or is that just something else that they don't consider? Well, Tyler, the problem with it is that he was not a citizen informant. He was an interested party. Did the cops know that? Yes. Actually, Deputy Craig in his deposition testified that when he was talking with Mr. McIntyre, he was shown by Mr. McIntyre his phone, which had the court order on it. So he knew that Mr. McIntyre had come down for court business on Monday and that there was irreconcilable differences about the custody of the child by looking at the phone. In addition, we talked about Kingsland in our case, where a police officer may not close his eyes to facts that would help clarify the circumstances. Ms. Bredbender told them, all the court documents are in my trunk. She told them the medicine is in the cabinet along with the prescription that I took. They never went to the medicine cabinet. They never investigated that. They've all testified that a breath test would have been helpful. Yet they administered none, and it's uncontroverted that she begged for them to give her one. I don't like McIntyre either, given what the state court found and how he parlayed this into four months of custody that he wasn't entitled to, and the state court found he lied to everybody all the way through. But I have doubts about any proposition that you can't consider as establishing probable cause, the statement of an interested party. I don't understand them to say they had probable cause based on what McIntyre had told them alone. They've never argued that that I know about. But we can't hold that just because somebody has a reason to talk to the police and to say what he's saying means that he must be lying. I wrote a case called Craig v. Singletary for the en banc court. I mentioned I wrote it because we know then it's correct. Yes, sir. But that was a criminal case. But we held in there that a co-defendant flipping and testifying that the defendant did it. I was there when he did it. He was the trigger man and whatnot. I forget what the worst part of the crime was, but he did the worst part of the crime in return for a reduction, of course, in sentence or charges, is by itself enough without anything else to support probable cause, even though he has a decade or more reasons to lie to get a reduced sentence. I guess we can avoid the question because they've never argued it. But I'm just, why shouldn't I be uncomfortable with the proposition that someone with an interest to lie can't provide probable cause to the cops based on his own statements and the cops making a determination. If he's telling the truth, this is really bad, and therefore we have arguable probable cause and arrest. The issue would be that you can use it, and it is part of the totality, but it has to be corroborated, and case says that, and dial says that. Craig V. Singletary on box says you can charge somebody with a crime without corroboration of the co-defendant's testimony and the co-defendant's getting a reduction in sentence for testifying. The problem here is that there's direct evidence showing that what he said is not the case and the child wasn't harmed because when they go to the house, the child is in bed safe. What was the time difference between his call and their arrival? I thought I had that. If I could tell you, Doc 26 is a stipulated agreement of material facts. 3.06 a.m., he calls the sheriff's office. He calls at 3.06, and Corporal Levine is first on scene. He's not there until 3.35. All right, so that's 29 minutes later. In the interim, remember, Hillsborough County Fire Rescue comes at 3.22. They're the first ones to encounter the residents, to knock on the door, but then they call and ask. Isn't there a disputed fact about whether they looked in the window? I don't think there's a disputed fact about that. I think that they did look in. Well, if there was a disputed fact, it's your client's favor anyway. Yes. To end in the minute that I have, I'd like to address Wesby. Wesby is a very different case than the one we have here, because in Wesby, actually if you look at footnote one, the Supreme Court's decision says it does not involve disputed facts. They took the facts as were given to them by the . . . The part of Wesby that sort of hurts your case. I'll do whatever they tell me to do if they tell me clearly enough, but it's hard to believe they mean that you've got to have a case on the specific facts. And that's not really, I think, the gist of that opinion. But Justice Thomas, in his opinion, does mention that, plus, they haven't pointed to any binding authority in their jurisdiction that said that this was not probable cause to make an arrest to the party goers. They haven't pointed to any binding authority that you've got to believe a suspect in what they tell you and so forth and so on. That's correct, but they also said a body of relevant case law is usually necessary, and it's not always, and this is such a case. And while we didn't argue it, you probably could decide this case under the third very narrow obvious because it's obvious that you can't just arrest everyone under a strict liability theory that you don't have a baby gate on top and you're sleeping heavy, therefore you've committed child neglect. So our issue is under the obvious you could probably do it, and I would encourage your honors, and I'm almost out of time, to look at Kingsland because Kingsland is a very interesting case that doesn't involve child neglect, but it's cited in our brief where there's an automobile accident involving a police officer. When they all show up, it's a dispute of who ran the light, and the on-scene officers immediately start interpreting everything in favor of the officer that they hope does not run the red light and cause the automobile accident, including that they start saying, well, you're impaired. Well, they don't investigate the impairment, which could, the court said, clearly have been caused by her head injuries, which she complained of the entire time at the scene. That's like the medicine cabinet that they don't go look in. And the second issue was they said, oh, we smell cannabis around the car, but they never do a car search to see if there is actual cannabis in the car to support the case. So that's like them not looking at and considering that EMT Bull at 322 declares her able to sign off that she does not need medical treatment and finds her aware enough to make that executive medical decision for herself. And our position is at the time that she signed a refusal for medical care because the EMT had told her she did not necessarily have to have it, it was up to her, they should have left the house because their investigation was over. He's declared her cognizant. He's done the Glasgow comma score on her. She's 15, and he finds her to be, originally when she woke up, she was oriented to time and to place. The only thing she wasn't oriented to is the situation. And she specifically testified she thought she was having a nightmare that these people were in her bedroom and that... In the non-colloquial sense. Yes. Okay. Thank you, counsel. Mr. Gardillo, four minutes, unless you need a little bit more. We might give you some more, but I don't think you will. Thank you, Your Honor. Going to the three ways to show clearly established law, this is the first time I've heard that they're going to try to argue the third way. It wasn't in summary judgment, it wasn't done in the briefs. That's not your biggest problem. I understand. I just wanted to... Well, that's on my mind. Going back to Judge Newsom's original question, what else was left out of Judge Scriven's orders? As I was listening to Mr. Maddox talk and I was taking notes and looking at the order itself, what she did leave out is the officers, when they got up to the bedroom and tried to wake her up, they weren't able to wake her up, which is why fire rescue had to come up. So there was a point in time where the officers tried to wake her up, she didn't wake up. Fire rescue took, and EMS Bull and his depo said it took him over five minutes, said she was hard to arouse. So the deputies witnessed that for themselves. They then witnessed 22 minutes between Ms. Breadbanner and fire rescue where he says in his own deposition, EMS, that he had to wait for the clouds to clear in 22 minutes for him to get vital signs and for him to get her to answer basic questions like her name, what day is it, who's the president, where are you, things of that nature. They were watching all that. So getting back to the point of does it matter if she was drunk or on prescription meds, it really didn't matter to them, which is why they don't do breathalyzers, why they don't care to look in the medicine cabinet, because they personally witnessed her level of inability to wake up and her incoherence for a 22-minute period. Was there anything in the record about whether they had a field breathalyzer test with them? They did not. Are those still the large way back in prehistoric time when I was doing that around that sort of thing? The only ones that had a big tabletop machine, is that now portable in cars? I believe they're portable. The only ones that carry them, though, in Hillsborough County are DUI investigators who have to be specially called to scenes when there's a major incident with a DUI. The problem used to be by the time you get somebody to a trooper station or a sheriff's office where they had a machine, they had metabolized some of the alcohol. That kind of goes towards that. Mr. Maddox made a comment, and I believe Judge Seiler earlier asked a question going towards this, that is it because someone doesn't have a baby gate, so every parent in America or in Florida is guilty of child neglect? We're not raiding people's homes looking for baby gates. This was a situation they got brought to because of a father's concern for his child. When they get there, they become very concerned by what they observe. She doesn't come to the door for fire rescue. She doesn't come to the door for sheriff's office. So they become more concerned. We need to see Mary. Make sure she's okay. Make sure this two-year-old's okay. That led them into the house. The entry was never sued upon, so I don't want to get too deep into that. However, when they went through the house, they went through the window. So Mr. Maddox says they went back later and retroactively found dangerous situations. Earlier I stated to Judge Seiler the two biggest things to them were the window and the stairs. They went through an open window, so they knew how easy it was to get in the house. Was there a screen on the window? They had to pry the screen off, Your Honor. Take the screen off? Correct. You just pop the screen off. Right. Pop or pry? I think they said pry. An open window with a screen on it pretty much would hold a child back there, unless you got a screwdriver and an iPhone. Possibly, or push on it. Got it and went and touched it. Again, we're getting very deep into what-ifs and that kind of thing. Let me ask you this, and I hadn't thought about it, but if she was so impaired, why did they let the mother carry the child down the stairs? Your Honor, they talked about that. Didn't have a free hand to grab the guardrail. They talked about that both at deposition and at the hearing, and they stated that there was a deputy in front of her and a deputy behind her with his hand on her to ensure that they went down the stairs safely. So it wasn't just go ahead downstairs, we're going to stay up here, and we'll see you downstairs. They guided her down the stairs, one in front and one behind with his hand on her. I think the biggest part of this case to me is the second method of providing clearly established law. In Eppley's brief, page 48, he basically argues broader principle. He concedes that the first method, there's no factually similar case. He conceded that. So he relies in the brief on the second way, and the broad principle is an arrest without probable cause is a constitutional violation, putting defendants on notice. That's the broad principle he relies on. Franson, this court, in Franson v. Jones, granted it was an excessive force case, not a false arrest, but specifically said on page 9 of the Franson case, the fact that the fourth protects against excessive force, in this case false arrest, does not provide any guidance as to what constitutes excessive force, in this matter false arrest. But in fairness, right, to him, I mean this was in response to my question. He said, I get it, Judge Newsom, I've got to put some meat on the bones. It's not that abstract principle, novel facts, here they are. And so this sort of gets me back to Judge Scriven's paragraph and sort of is it sufficiently weedsy or not. And again, I go back to the she leaves out, they're watching, they can't wake her up. They're watching fire rescue not be able to wake her up. They're watching 22-minute exchange of fire rescue where she's yelling, she's telling people to come back to bed that they thought she meant them. She's yelling at fire rescue, get out. She's not able to answer questions at first. So we're all on the same page, I think, right? I mean that's where this case is. It's not in bucket 1. It's really not in bucket 3, obvious clarity. It is in bucket 2, broad principle as applied to novel facts. Here are the facts. Is that or ain't that enough, right? I mean aren't we all talking about the same thing? We are, but again, the Supreme Court in both the Wesby case, the Supreme Court in White v. Pauley also says when we have a case such as this one that are so novel in fact that we can't find anything else anywhere similar to it, which is this case, that's a clear indication that qualified immunity should be granted. Unless Arnold is more extreme than this case and we have a DCA holding that that's not enough. And again, Your Honor, and that kind of goes towards the two cases presented by the appellee. One is Bevere, which is a Seventh Circuit case, not binding. The second one is City of St. Pete v. Ostrito, which is a second DCA case, which again courts have held this, court has held, Supreme Court has held, that district courts of appeal on the state level aren't capable of providing binding case law that gives the fair warning to law enforcement. And I'm curious now, does that apply, does that principle, that it's U.S. Supreme Court, Eleventh Circuit, and in this case Florida Supreme Court, does that apply only in bucket one or does it kind of bleed over into bucket two? I believe it bleeds into both. Okay, interesting. All right, counsel, thank you. We'll take that case under submission. We're going to go ahead.